T. Burke Wonnell
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: burke_wonnell@fd.org

Counsel for Defendant James Buster Bowen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>   vs.<br><br>JAMES BUSTER BOWEN,<br><br>              Defendant. | Case No. 3:19-cr-00037-SLG-DMS<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS** |

Defendant James Buster Bowen, by and through undersigned counsel, moves to suppress all evidence obtained from the warrantless arrest of Defendant and seizure of his bag at the Kenai Airport on October 24, 2018. Defendant further moves to suppress all evidence derived from and tainted by these Constitutional violations as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963).

## I.    FACTUAL ALLEGATIONS

The following factual allegations are derived from police reports and other discovery provided to date by the government. These allegations are accepted for the purposes of arguing this

motion only.  Defendant reserves the right to challenge any and all of these allegations at trial.

According to a search warrant affidavit and the reports of involved investigators, on October 24, 2018, at approximately 4:40 P.M., Investigator Levi Russell was advised of a suspicious passenger who was attempting to fly from Kenai to Anchorage on Ravn Airlines. See Exhibit "A", Partial Affidavit Supporting Request for Electronic Monitoring Warrant, attached.  The passenger was identified as James Bowen.  Previously, on October 19, 2019, Investigator Russell had received a tip from Kenai Police Department (hereinafter "KPD") Lieutenant Langham that Nick Bown, James' brother, was suspected of selling heroin. Russell was told that James Bowen arrived at the airport as his flight was boarding, then went to his vehicle and missed the flight.  Bowen did not request a refund and proceeded to buy a ticket on Grant Airlines with cash.  Russell responded to the Kenai airport and learned from both the Grant and Ravn Airlines that Bowen did not have a return ticket purchased.

Russell was told that Bowen's original ticket on Ravn Airlines was purchased by Holli Driver, and learned that she had prior drug convictions.  He learned that Bowen and Driver were the registered owners of a black 2005 Chevy pickup that was left at the airport when Bowen flew to Anchorage.  At approximately

*United States v. James Buster Bowen*
Case No. 3:19-cr-00037-SLG-DMS                                    Page 2

6:45 P.M., Russell was contacted by the KPD dispatch center and notified that employees at Grant Aviation contacted them when it was learned that Bowen had booked a one-way flight back to Kenai and paid with cash, and that he was scheduled to land in Kenai at 7:30 P.M.

Russell responded to the airport and learned that Bowen did not have any checked luggage on either of his flights, but had a backpack for a carry on when he flew to Anchorage.

Russell and Investigator Austin MacDonald were inside the airport when the Grant flight landed at the Kenai Airport. Russell observed Bowen enter the airport from the runway, carrying a blue Dakine brand backpack, and head towards the exit. Russell contacted Bowen prior to his exiting the building and identified himself and Inv. MacDonald as law enforcement. Both investigators were in plain clothes. Bowen agreed to speak with them and they moved to a back hallway of the airport.

Bowen stated he had been in Anchorage for the day and estimated he flew up at 4:30 P.M. He said he'd travelled to Anchorage to see his dad and his dad's girlfriend, and flew back at 7:30 P.M. because his dad had left for work on the slope. He said his dad lived near Jewel Lake, and that he went to Anchorage to pick up a spare truck key and wallet he had left up there when he had driven his dad to Anchorage previously. He

*United States v. James Buster Bowen*
Case No. 3:19-cr-00037-SLG-DMS                                      Page 3

said the wallet and key had been in Anchorage for a week and a half.

Bowen stated he was picked up by his dad at the airport and driven to his dad's house. Bowen believed that his dad was flying to the slope the next morning. When asked why he'd flown back that evening if his dad was flying out in the morning, Bowen stated he wanted to be home with his girlfriend. Bowen said he didn't want to drive to Anchorage since he doesn't have a license. Bowen stated he went to get his stuff because he didn't want to leave it at his dad's for a few weeks. Bowen indicated the short time of his trip was normal because he needed to get his items. Russell asked Bowen why his dad couldn't have mailed the items to him, and he said it would have taken a couple of days and that he wanted to see his dad. Bowen continued to say that he had his girlfriend here when again asked why he didn't stay longer with his dad.

Bowen stated he purchased the flight to Anchorage with a debit card online and purchased a return ticket. Bowen showed Russell the itinerary for his Ravn flight on his phone. He stated he flew up on Ravn, but flew back on Grant since they had a flight at 7:00 P.M. Russell argued that the itinerary did not include a return flight. Bowen stated he bought the ticket with

his girlfriend's debit card and then purchased the return flight on Grant with cash.

Bowen stated his girlfriend or roommate was picking him up at the airport. He identified his residence as 35310 Rockwood Drive. He was confronted about the sequence of events, specifically about flying to Anchorage on Ravn Airlines, and was told that the characteristics of his trip were consistent with someone transporting controlled substances. Bowen was asked for consent to search his belongings. Bowen refused. He insisted that he flew to Anchorage on Ravn, and then admitted to flying up on Grant after being confronted about it. Bowen was then told that he was being detained. Bowen insisted on leaving the airport and maintained that he went to Anchorage to see his father.

Russell observed scars on the top of Bowen's right hand and a small scab, and suggested that Bowen used drugs. Bowen denied using any controlled substances. Bowen was told that he was going to be detained while investigators applied for a search warrant to search his person and his backpack. Bowen then stated he needed to call his girlfriend. Bowen invoked his right to counsel. As the investigators were placing Bowen into handcuffs, he began to resist the handcuffing process. Bowen was eventually handcuffed. During the struggle to handcuff

Bowen, he dropped an iPhone he was using. The phone was seized and placed into airplane mode by the investigators. Russell checked the handcuffs for tightness and double locked them. During this time, KPD Officer Smith assisted with detaining Bowen and securing his phone.

Bowen was briefly removed from handcuffs to take off his backpack. Bowen and the backpack were then placed in a patrol car and transported to KPD by Officer Herrin. Prior to leaving the airport, Russell was provided copies of Bowen's itinerary from Grant and Ravn Air. At the police station, Bowen was placed in an interview room. Once in the interview room, Bowen began to audibly cry. Russell could hear him outside the room with the door shut. Bowen was provided with a phone and the opportunity to make phone calls. He made statements to Inv. MacDonald that he needed to make multiple phone calls prior to speaking with them. After making his phone calls, Bowen stated he was willing to speak with the investigators. He was advised of his Miranda rights from a prepared card, and then agreed to speak.

Bowen's statements were incriminating. Those statements led to the issuance of a search warrant for the Dakine backpack. That search turned up a distributable amount of heroin. This evidence in turn started a months-long investigation leading to

*United States v. James Buster Bowen*
Case No. 3:19-cr-00037-SLG-DMS                                    Page 6

the issuance of a LoJack warrant, cell phone dumps, a search of Bowen's residence, contact with other witnesses, and the search of a truck, all providing incriminating evidence against James Bowen and all directly derived from his arrest at the Kenai Airport on October 24th, 2018.

## II.  SEARCH AND SEIZURE

### 1.  Stops vs. Arrests

The Fourth Amendment to the United States Constitution holds that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  This amendment has been interpreted to permit limited detentions under certain circumstances.  Under Terry v. Ohio, 392 U.S. 1 (1968), a brief stop and detention of a person for investigative purposes does not violate the Fourth Amendment so long as the officer has a "reasonable suspicion" that criminal activity may be afoot.

To determine whether a stop was supported by reasonable suspicion, a court must "consider whether, in light of the

Case 3:19-cr-00037-SLG   Document 18   Filed 04/18/19   Page 7 of 18

totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." U.S. v. Palos-Marquez, 591 F.3d 1272, 1274-1275 (9th Cir. 2010) (internal citation omitted). However, a mere "hunch" or "inchoate and unparticularized suspicion" will not suffice. See Terry, at 27. The allegations made by a known and reliable informant can be sufficient for a finding of reasonable suspicion. United States v. Rowland, 464 F3d 899 (9th Cir. 2006); United States v. Palos-Marquez, 591 F3d 1272 (9th Cir. 2010). Rowland provides a useful compendium of factors the court may consider in determining whether an informant's statement is sufficient to support a stop. These include whether the police met personally with the informant, whether the informant explained the basis for knowledge, and whether the informant's tip provided predictive information that police could corroborate.

Terry stops are distinguishable from arrests. In a typical Terry stop for which an officer has no reason to suspect danger, it is a Fourth Amendment violation for the officer to employ aggressive tactics such as drawing a weapon, forcing a subject to lie prone on the ground, or using handcuffs. United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir.1990). "The police may not employ such tactics *every time* they have an 'articulable basis'

Case 3:19-cr-00037-SLG   Document 18   Filed 04/18/19   Page 8 of 18

for thinking that someone may be a suspect in a crime."
Washington v. Lambert*,* 98 F.3d at 1181, 1187 (9th Cir.
1996)(emphasis in original). The Ninth Circuit has enumerated
examples of "special circumstances" under which intrusive
techniques may be used to effectuate a Terry stop:

> 1) where the suspect is uncooperative or takes action at
> the scene that raises a reasonable possibility of danger or
> flight; 2) where the police have information that the
> suspect is currently armed; 3) where the stop closely
> follows a violent crime; and 4) where the police have
> information that a crime that may involve violence is about
> to occur.

Lambert*,* at 1189.

A number of Ninth Circuit cases illustrate the types of
conditions under which aggressive police actions during a Terry
stop are warranted, and therefore do not constitute an arrest.
See, e.g., United States v. Miles*,* 247 F.3d 1009, 1011–13 (9th
Cir. 2001)(approaching suspect with guns drawn, forcing him to
kneel and handcuffing him before conducting any investigation
did not constitute an arrest where officers had a report of an
armed suspect and were outnumbered three to two in the immediate
vicinity); Allen v. City of Los Angeles*,* 66 F.3d 1052, 1055–57
(9th Cir. 1995)(intoxicated passenger forced to lie on the
ground and handcuffed at gunpoint, held not to constitute an
arrest where companion was combative, passenger was drunk and
stop was preceded by a high-speed car chase); United States v.

<u>Alvarez</u>*,* 899 F.2d 833, 836–839 (9th Cir. 1990)(no arrest where police approached with weapons drawn after receiving credible tip that subject possessed explosives); <u>United States v. Greene</u>*,* 783 F.2d 1364, 1366–68 (9th Cir. 1986) (police ordered subject seated in a car to place hands on the headliner and drew weapons when he did not immediately comply, held not to constitute an arrest where police had informant's report that the suspect was in possession of a pistol); <u>United States v. Taylor</u>*,* 716 F.2d 701, 708–09 (9th Cir. 1983)(no arrest when police handcuffed companion of suspected drug dealer at gunpoint where police had strong evidence of drug activity and received briefing that dealer and his companions should be considered dangerous); and <u>United States v. Bautista</u>*,* 684 F.2d 1286, 1287–90 (9th Cir. 1982) (handcuffing of two subjects justified, and not an arrest, where police suspected subjects of armed robbery and knew that a third suspect might still be in the vicinity).

By contrast, where officers have no reason to suspect danger, or where the suspected offense is minor or non-violent, aggressive actions during an investigative stop can constitute an arrest. For example, in <u>Del Vizo</u>*,* officers stopped the driver of a van after surveillance indicated that the driver had just completed a drug transaction. Police approached with weapons drawn, ordered the driver out of the van, forced him to

lie down on the street, and handcuffed him. Id., at 823. The

Ninth Circuit held that the police conduct constituted an arrest

under the circumstances, and therefore required a showing of

probable cause. Id. at 824. The Court of Appeals further stated

that mere suspicion of drug trafficking did not justify the

extent of the restraints to effectuate an investigative stop,

noting that the driver was compliant and there was no evidence

suggesting he was dangerous. Id., at 825. A finding of

probable cause sufficient to support an arrest is appropriate if

"under the totality of the circumstances known to the arresting

officers, a prudent person would have concluded that there was a

fair probability that [an arrestee] had committed a crime."

U.S. v. Carranza, 289 F.3d 634, 640 (9th Cir. 2002)(quoting U.S.

v. Garza, 980 F.2d 546, 550 (9th Cir. 1992)). Where the

government relies on an informant's tip, "[i]t is enough, for

purposes of assessing probable cause, that 'corroboration

through other sources of information reduced the chances of a

reckless or prevaricating tale,' thus providing 'a substantial

basis for crediting the hearsay.'" Illinois v. Gates, 462 U.S.

213, 244-45 (1983). Factors that help determine whether

an informant is credible include the informant's basis for

knowledge, and police corroboration of the information. See,

e.g., United States v. Tarazon, 989 F.2d 1045, 1048-49 (9th Cir.

1993).  However, corroboration of innocent facts provided by a tipster of dubious credibility does not support a finding of probable cause.  <u>U.S. v. Hall</u>, 113 F.3d 157, 159 (9th Cir. 1997).

2.   <u>Tainted Confessions and Suppression</u>

A confession given after an arrest on less than probable cause is inadmissible, even if the arrestee is Mirandized.  See <u>Dunaway v. New York</u>, 442 U.S. 200 (1979).  In that case, the Supreme Court reversed convictions for attempted robbery and felony murder based upon tainted statements of the accused:

> On March 26, 1971, the proprietor of a pizza parlor in Rochester, N.Y., was killed during an attempted robbery. On August 10, 1971, Detective Anthony Fantigrossi of the Rochester Police was told by another officer that an informant had supplied a possible lead implicating petitioner in the crime.  Fantigrossi questioned the supposed source of the lead—a jail inmate awaiting trial for burglary—but learned nothing that supplied "enough information to get a warrant" for petitioner's arrest. Nevertheless, Fantigrossi ordered other detectives to "pick up" petitioner and "bring him in." Three detectives located petitioner at a neighbor's house on the morning of August 11. Petitioner was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave. He was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by officers after being given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner waived counsel and eventually made statements and drew sketches that incriminated him in the crime.

<u>Id.</u>, at 202-203(citations omitted).

Case 3:19-cr-00037-SLG   Document 18   Filed 04/18/19   Page 12 of 18

In tossing the evidence, the Supreme Court noted that "[t]here can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station." Id., at 207.  The government attempted to argue that the seizure in that case was justified by the post-Terry "reasonable suspicion" line of cases.  The Supreme Court disagreed:

> In contrast to the brief and narrowly circumscribed intrusions involved in those cases, the detention of petitioner was in important respects indistinguishable from a traditional arrest. **Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.** The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in Terry and its progeny. Indeed, **any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.**
>
> Id., at 212-213(citations omitted) (emphasis added).

The Supreme Court next addressed whether or not the taint stemming from the illegality of the arrest was attenuated by the <u>Miranda</u> advisement:

> There remains the question whether the connection between this unconstitutional police conduct and the incriminating statements and sketches obtained during petitioner's illegal detention was nevertheless sufficiently attenuated to permit the use at trial of the statements and sketches. [. . .]  "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." *Id.,* at 602, 95 S.Ct., at 2261.  Consequently, although a confession after proper *Miranda* warnings may be found "voluntary" for purposes of the Fifth Amendment, this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis[.] [. . .]
>
> Beyond this threshold requirement, *Brown* articulated a test designed to vindicate the "distinct policies and interests of the Fourth Amendment." *Id.,* at 602, 95 S.Ct., at 2261. Following *Wong Sun,* the Court eschewed any *per se* or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest," 422 U.S., at 600, 95 S.Ct., at 2260; see *Wong Sun v. United States, supra,* 371 U.S., at 488, 83 S.Ct., at 417. *Brown*'s focus on "the causal connection between the illegality and the confession," 422 U.S., at 603, 95 S.Ct., at 2261, reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts.

*Brown* identified several factors to be considered "in determining whether the confession is obtained by exploitation of an illegal arrest[:t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . . And the burden of showing admissibility rests, of course, on the prosecution." *Id.,* at 603-604, 95 S.Ct., at 2261-62. Examining the case before it, the Court readily concluded that the State had failed to sustain its burden of showing the confession was admissible. In the "less than two hours" that elapsed between the arrest and the confession "there was no intervening event of significance whatsoever." *Ibid.* Furthermore, **the arrest without probable cause had a "quality of purposefulness" in that it was an "expedition for evidence" admittedly undertaken "in the hope that something might turn up."** *Id.,* at 605, 95 S.Ct., at 2262.

The situation in this case is virtually a replica of the situation in *Brown.* Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. Nevertheless, three members of the Appellate Division purported to distinguish *Brown* on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal seizure and detention) and that the police conduct was "highly protective of defendant's Fifth and Sixth Amendment rights." 61 A.D.2d, at 303, 402 N.Y.S.2d, at 493. This betrays a lingering confusion between "voluntariness" for purposes of the Fifth Amendment and the "causal connection" test established in *Brown.* Satisfying the Fifth Amendment is only the "threshold" condition of the Fourth Amendment analysis required by *Brown.* **No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth."**

<u>Id.</u>, at 216-218(emphasis added).

### III. <u>ARGUMENT</u>

The facts of this case present a close question as to whether or not law enforcement had a particularized suspicion that a specific crime was afoot versus a mere hunch. The tip from the KPD Lieutenant, lacking in any specificity or identifiable source, implicated Bowen's brother as opposed to Bowen himself. Bowen's girlfriend had priors. He gave inconsistent reasons for flying to Anchorage and back so soon. These are not factors supporting a particularized suspicion, but rather provide a generalized suspicion. This analysis, however, is a red herring. Even if police had a reasonable suspicion that would support a limited <u>Terry</u> detention, this seizure went well beyond anything resembling an investigative stop. The investigators needed probable cause to support this arrest.

<u>Dunaway</u> is almost directly on point in this case. Regardless of whether Investigators Russell and MacDonald characterized the seizure as an "arrest" or as a temporary detention "while investigators applied for a search warrant to search his person and his backpack", it's what they did that matters for this analysis. They cuffed Bowen. He resisted being cuffed. They put him in a patrol car. They took him to the police station. They threw him in an interrogation room. He cried. They Mirandized him. They interrogated him. He

confessed. He was never informed that he was free to go. There was no causal or temporal break between the illegal seizure and the sought after confession. This arrest could only be characterized as "an expedition for evidence".

Even if the government could argue that these facts make out a borderline reasonable suspicion finding, they are nowhere near sufficient to support probable cause to believe that Bowen had committed any specific offense. No valid warrant could issue for a search of Defendant's person or his bag based only on the information available prior to the custodial interrogation. Mirandizing Defendant does not attenuate that taint. All of the evidence against Bowen was obtained through the exploitation of the illegal arrest. All of the evidence must therefore be suppressed.

## IV.  CONCLUSION

Based upon the foregoing, Defendant respectfully moves the Court to order the suppression of all evidence obtained at and subsequent to the commencement of his illegal detention.

//

//

DATED at Anchorage, Alaska this 18th day of April, 2019.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

*/s/ Burke Wonnell*
Burke Wonnell
Assistant Federal Defender
Counsel for James Buster Bowen
AK Bar No. 9610049

Certificate of Service:
I hereby certify that I electronically
filed the foregoing and any
attachments with the Clerk of Court
for the United States District Court
for the District of Alaska by using
the district's CM/ECF system on April
18, 2019. All participants in this
case are registered CM/ECF users and
will be served by the district's
CM/ECF system.
*/s/ Burke Wonnell*